1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE LUIS HERRERA SANCHEZ, | Case No. 1:15-cv-00510-SMS |
| Plaintiff, | |
| v. | ORDER REVERSING AND REMANDING AGENCY'S DENIAL OF BENEFITS |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Jose Luis Herrera Sanchez seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) ("the Act").  The matter is before the Court on the parties' cross-briefs, which were submitted without oral argument to the Magistrate Judge.  Following a review of the record and applicable law, the Court reverses the Commissioner's determination to deny benefits and remands this action to the Administrative Law Judge ("ALJ").

## I.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

A.  *Procedural History*

Plaintiff applied for SSI on February 24, 2012.  The Commissioner denied Plaintiff's claim

---

[1]  The relevant facts herein are taken from the Administrative Record ("AR").

on August 16, 2012, and upon reconsideration on February 14, 2013.  AR 33, 52.  At a hearing on June 10, 2014, before ALJ Sharon Madsen, Plaintiff appeared with counsel.  Also at the hearing were an impartial vocational expert ("VE") and an interpreter.  AR 440.  Thereafter, on June 24, 2014, the ALJ issued a written decision finding Plaintiff not disabled under the Act.  AR 23.  On January 26, 2015, the Appeals Council denied review of the ALJ's decision, which thus became the Commissioner's final decision, and from which Plaintiff filed a timely complaint.  AR 4, Doc. 1.

B.  *Factual Background*

1.  Written Testimony

In his initial disability report, Plaintiff stated "back and stomach problems post gunshot wound" limited his ability to work.  He responded "No" to questions about his ability to speak, read, write, and understand English.  He also responded "No" to the question of whether he could "write more than [his] name in English."  Plaintiff was last employed in 1993 as a farmer worker, a job which involved working in the fields all day picking, stacking, and sorting.  Plaintiff answered "yes" to the question of whether he wrote, completed reports or performed similar duties.  AR 132-133.  The field officer who interviewed Plaintiff face-to-face noted he spoke "with limited understanding due to lack of knowledge" and had difficulty with reading, understanding, coherency, concentrating, standing, and walking.  AR 129.

Plaintiff also completed two questionnaires by handwriting:  an Exertion Questionnaire completed in June 2012 and a Pain Questionnaire competed in January 2013.  In the former, he reported: (1) dizziness, loss of balance, being slow, feeling tired and difficulty with comprehension; (2) eating very little because his intestines did not function normally; and (3) being unable to walk short or long distances, carry things, and lift heavy boxes, bags or animals.  He did not drive, do household chores or yardwork.  The pain made sleeping difficult and caused him to wake every three to four hours.  He used a cane when walking.  AR 140-142.

The Pain Questionnaire revealed that in September 1999, Plaintiff was shot multiple times in

2

the stomach by an officer, and one of the bullets remain lodged in his spine.  Consequently, he suffered constant pain in his torso including the back, stomach, waistline, chest, and heart.  He also experienced pain in the throat and pelvic area.  His daily medications—Gabapentin, Esomeprazole, Phenytoin, and Acetaminophen—while helpful caused blurry vision.  Functionally, Plaintiff could walk to the yard and sit or stand for five to fifteen minutes at a time.  AR 150-154.

    2.  Medical Evidence

Plaintiff underwent numerous surgeries as a result of the shooting.  They included: transverse colectomy, distal pancreatectomy, splenectomy, colostomy, thoracotomy with diaphragmatic repair, and appendectomy.  AR 188.  The last of these procedures was a colostomy takedown performed in May 2000 through Community Regional Medical Centers (CRMC), where he has continually received care since October 1999.  AR 437, 439.  Plaintiff had a family history of seizures.  AR 406.  Days after the colostomy takedown in May 2000, he experienced a seizure and received emergency care.  A computerized tomography (CT) scan of the head was, however, negative.  AR 435-436.

Between March 2003 and April 2014, Plaintiff was often hospitalized following a seizure, complaints of abdominal and/or pelvic pain.  On a number of occasions Plaintiff required an interpreter.  AR 345, 363.  In March 2003, Plaintiff was hospitalized with complaints of abdominal pain and vomiting.  His mother reported Plaintiff had suffered seizures sporadically for at least the past fifteen years.  AR 416-419.  A CT scan of his head was negative and an x-ray of his abdomen showed "no evidence of any acute intra-abdominal pathology" and "no significant intrathoracic abnormalities."  AR 408-409.

In April 2005, Plaintiff was hospitalized after suffering a seizure.  He complained of abdominal pain in the area of his surgical scar.  AR 401.  In May 2005, Plaintiff was hospitalized after severe nausea and vomiting, abdominal pain, leukocytosis, and dehydration.  A CT scan revealed small bowel obstruction.  He was not taking any medications.  AR 379-380.  In December 2005, a CT scan taken after Plaintiff was involved in a motor vehicle accident showed no acute

fracture, but right maxillary sinus disease.  AR 374-375.

In February 2006 and July 2007, CT scans were taken of Plaintiff's abdomen and pelvis.  On impression, they revealed diverticulosis without diverticulitis, no intraabdominal disease and the absence of a spleen.  AR 351-352.  In March and July 2008, CT scans were taken of his brain, abdomen, and pelvis, after Plaintiff was hospitalized after a seizure.  Results showed no fracture or dislocation, but a "small amount of ascites within the abdomen which is unusual for a male" although no evidence to suggest their cause.  AR 325, 330, 340, 344.  In May 2009, a CT and MRI were taken after Plaintiff was again hospitalized with complaints of abdominal pain.  The CT scan showed small bowel obstruction and the MRI showed "[r]ight paracentral disc protrusion at the 5-1 level with disc desiccation and likely annular tear."  AR 304, 311, 317.

In 2011, Plaintiff was hospitalized numerous times due to one or more of the following: seizure; complaints of back and neck pain; complaints of fever, sweating, coughing, sore throat and chest tightness; and partial small bowel obstruction.  A CT scan in September 2011 showed small bowel obstruction "perhaps due to adhesion from history of multiple intraabdominal surgeries" and "[d]iffuse fatty liver infiltration."  And with an exception to the feeding tube needing to be repositioned, an x-ray of the chest was unremarkable.  AR 188, 194, 204, 265, 274, 291, 293, 300.

In February and August 2012, Plaintiff was hospitalized with complaints of abdominal, chest and/or epigastric pain. He reported having similar pain when he was hospitalized for small bowel obstruction.  He denied smoking, drinking, using illegal drugs, depression, hopelessness or anxiety. He reported having three seizures between January and August.  AR 253, 260.  In August, at the request of the Department of Social Services, Rustom F. Damania, M.D., completed an internal medicine evaluation.  During the evaluation, Plaintiff complained of low back pain, bronchial asthma, difficulty urinating, grand mal seizures, and a "history of abdominal wound."  He reported the last seizure occurred in November 2011, and that without medications, the seizures occurred "very frequently but once he is on his medication it may occur once a year."  Dr. Damania noted

4

Plaintiff's surgical "wound is now very well healed."  With some encouragement, Plaintiff walked across the room without his cane, which he had been using for ten years.  It was unclear why he needed a cane, but Plaintiff reported fear of having a seizure or falling.  Dr. Damania diagnosed Plaintiff with chronic low back pain and abdominal pain secondary to gunshot wound injury, and grand mal seizure disorder.  He opined that functionally, Plaintiff should be able to: (1) lift and carry twenty pounds occasionally and ten pounds frequently; (2) stand and walk eight hours out of an eight-hour workday with normal breaks; and (3) sit for six hours out of an eight-hour workday. Plaintiff had no postural, manipulative, visual, and communicative limitations.  There was no evidence to justify the use of an assistive device for ambulation.  Plaintiff would, however, have trouble climbing and balancing because of his seizure disorder.  An interpreter was utilized at the evaluation.  AR 217-222.

In February 2013, Plaintiff visited CRMC with complaints of dizziness.  He was assessed with atypical chest pain, chronic headache, hematochezia, gastroesophageal reflux disease, stable seizure, and neuropathic pain.  AR 248-249.  Nine months later, he appeared for a follow-up and reported suffering one seizure episode per week.  He was again assessed with stable seizure, hematochezia, and gastroesophageal reflux disease.  AR 243-245.

In January 2014, Plaintiff was examined by clinicians at Fresno County Mental Health (FCMH).  He appeared appropriately groomed, exhibited some psychomotor retardation and slowed, but coherent, speech.  He reported experiencing sadness, irritation, helplessness, difficulty concentrating, and suicide ideation on a daily basis.  The clinicians diagnosed Plaintiff with posttraumatic stress disorder (PTSD) and major depressive disorder, and gave him a GAF score of 45.[2]  AR 229-230.

---

[2]  "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.  According to the DSM–IV, a GAF score between 41 and 50 describes serious symptoms or any serious impairment in social, occupational, or school functioning." *Garrison v. Colvin*, 759 F.3d 995, 1003 (9th Cir. 2014)

In March 2014, Plaintiff visited CRMC with complaints of chest pain and hematochezia.  He was assessed with intermittent rectal bleeding which was likely hemorrhoidal and advised to take daily aspirin to address the intermittent chest pains.  AR 239-241.  And, most recently, in April 2014, Plaintiff complained of a recent seizure and chest pain.  AR 235.

   3.   Hearing Before ALJ

      a.  *Plaintiff's Testimony*

Appearing before the ALJ with a Spanish interpreter, Plaintiff testified he completed the sixth grade in Mexico and understood "[a] little bit" of English.  AR 444.  His daily routine consisted of sitting outside in the morning and taking naps.  He did not cook, do household chores or engage in any social activities.  He needed help with dressing and bathing.  AR 445.  Physically, he could not lift and carry anything, could stand for five to ten minutes at a time, sit for fifteen minutes at a time, and walk about half a block.  AR 448.  He could not bend or twist his body at the waist.  He could, however, lift the cane he used, which was about two pounds.  AR 453.  When asked about the shooting, Plaintiff explained it was a case of mistaken identity.  AR 448-449.

Plaintiff continued to take medications for his stomach pains, which "comes and goes." Additionally, he took medications for heartburn, rectal bleeding, and seizures.  He still suffered chest pains and, at the time, was treating his depression with weekly therapy.  AR 446-449.

When questioned by his counsel about the seizures, Plaintiff stated he would lie down for about five to six hours after an episode, and take one to two days to recover.  Because of the mid-back pain and medication side effects, namely sleepiness, Plaintiff lies down about eight hours per day.  AR 450-451.  He also experienced suicidal thoughts about once a week.  AR 454-455.

      b.  *Vocational Expert's Testimony*

The VE, Katie Macy-Powers, answered a number of hypotheticals posed by the ALJ and Plaintiff's counsel.  First, she was asked to consider a person of the same age, education, and work

background, with the following limitations: "typical seizure precautions, no climbing ladders, ropes, or scaffolds, working at heights, around dangerous machinery, or driving." The VE opined that such person could perform the work of a hospital cleaner, dining room attendant, and sorter. Second, she was asked to consider the same person except that he could lift and carry fifty pounds occasionally and twenty-five pounds frequently, and could only perform simple routine tasks. The VE replied that the same jobs applied. Third, she was asked to consider the person under the second hypothetical with the addition that such person would likely be absent from his work for four days out of a month. The VE opined there were no jobs available to such person. Finally, the VE was asked to consider the same person from the second hypothetical but that such person: would require unscheduled breaks of one hour in length, could concentrate in only two-hour increments, and could only stay on task for about one hour before getting off task for one hour. The VE opined there were no jobs available to such person. AR 455-456.

When asked if her testimony was consistent with the Dictionary of Occupational Titles (DOT), the VE replied, "Yes, it is with the [ex]ception of my response in regards to absenteeism or extra breaks. That is not addressed by the <u>DOT</u>. That response is based upon my experience. AR 457 (emphasis in original).

4. <u>ALJ's Decision</u>

A claimant is disabled under Title XVI if she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of no less than twelve months. 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process which an ALJ must employ to evaluate an alleged disability.[3]

---

[3] "In brief, the ALJ considers whether a claimant is disabled by determining: (1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments that has lasted for more

In her written decision, the ALJ here found that at step one, Plaintiff had not engaged in substantial gainful activity since the application date of February 24, 2012. At step two, Plaintiff had the following severe impairments: (1) seizure disorder; (2) lumbar degenerative disease; and (3) status post gunshot wound of the abdomen with multiple surgeries. At step three, Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff had the residual functional capacity (RFC) to lift and carry fifty pounds occasionally and twenty-five pounds frequently, and sit, stand and walk six to eight hours in an eight-hour workday with normal breaks. He could not: (1) climb ladders, ropes or scaffolds; (2) work at heights or with dangerous machinery; and (3) drive. He was limited to simple routine tasks. At step four, Plaintiff had no past relevant work. Finally, at step five, the ALJ found there were jobs in the national economy existing in significant numbers which Plaintiff could perform, considering his age, education, work experience and RFC. They included hospital cleaner, dining room attendant, and sorter. Consequently, the ALJ concluded that Plaintiff was not disabled as defined under the Act since February 24, 2012. AR 17-22.

## II. DISCUSSION

A. *Legal Standards*

This Court reviews the Commissioner's final decision to determine if the findings are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 401 (1971)), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. "If the evidence can reasonably support either affirming or reversing a decision, we may not

---

than 12 months; (3) whether the impairment meets or equals one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity, the claimant can still do his or her past relevant work; and (5) whether the claimant can make an adjustment to other work. The claimant bears the burden of proof at steps one through four." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

substitute our judgment for that of the Commissioner.  However, we must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal citation and quotations omitted).  "If the evidence can support either outcome, the Commissioner's decision must be upheld."  *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003); *see* 42 U.S.C. § 405(g) (2010).  But even if supported by substantial evidence, a decision may be set aside for legal error.  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

Moreover, an ALJ's error is harmless "when it was clear from the record that [the] error was inconsequential to the ultimate nondisability determination."  *Robbins v. Soc. Sec. Admin*. 466 F.3d 880, 885 (9th Cir. 2006).

B.  *Analysis*

Plaintiff raises three issues on appeal.  He contends the ALJ erred in: (1) failing to reconcile the conflict between the DOT and the VE's testimony, (2) dismissing Plaintiff's pain testimony, and (3) failing to include and consider all of Plaintiff's impairments in the RFC determination.

1.  Conflict Between DOT and VE's Testimony

Plaintiff contends there were "unexplained inconsistencies" between the VE's testimony and the DOT.  That is, the VE testified Plaintiff could perform jobs under the DOT involving skills—in this case the ability to read and write in English—which exceeded his capabilities as determined by the ALJ.  This, according to Plaintiff, required resolution by the ALJ, and her failure to recognize the inconsistency and resolve it was error.   The Commissioner avers: (1) the reading and writing skills required do not refer specifically to the English language, which has little significance in the performance of the unskilled jobs opined by the VE; (2) Spanish is the dominant language on jobsites in the Central Valley farming communities; (3) Plaintiff has performed such skills in his past jobs; and (4) to the extent that an inconsistency exists, the record as a whole provided sufficient

resolution.  The Commissioner's many counterarguments, supported by unpersuasive legal authority, however, do not detract from the ALJ's error.

As an initial matter, Plaintiff's counsel did not raise this issue at the hearing before the ALJ. *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999), *as amended* (June 22, 1999) ("at least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal").  Nonetheless, the Court will address the issue to avoid a manifest injustice, which it believes occurred.  *Id.* ("[w]e will only excuse a failure to comply with this rule when necessary to avoid a manifest injustice").  Further, "Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).

"Once a claimant has established that he or she suffers from a severe impairment that prevents the claimant from doing any work he or she has done in the past, the claimant has made a prima facie showing of disability."  *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  Thereafter, at step five of the disability determination process, "the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in significant numbers in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience."  *Id.* (internal quotations and citation omitted).  Along with the numerical grade level, "[t]he term education also includes [the ability] to communicate in English since this ability is often acquired or improved by education."  20 C.F.R. § 416.964(b).  Thus, a person's education level is evaluated by considering, among other, the ability to read and write and communicate in English—"the dominant language of the country"—regardless of "what other language [the] person may be fluent in."  20 C.F.R. § 416.964(b)(1), (5).

Having completed the sixth grade, Plaintiff had a "marginal education."   20 C.F.R. § 416.964(b)(2) ("formal schooling at a 6th grade level or less").  Importantly, his education was

acquired in Mexico, where English is not the dominant language.  It is thus undisputed that English posed a problem for Plaintiff.  While stating he could understand "[a] little bit," his written testimony indicated he could not speak, read or write, in English.  This is supported by the field officer's observations and by the need for an interpreter on a number of occasions, including the administrative hearing.  And importantly, the ALJ found Plaintiff was illiterate because he was "not able to communicate in English[.]"  AR 21.  But the jobs opined by the VE—hospital cleaner, dining room attendant, and sorter—all required the ability to read and write.[4]  The occupational evidence from the VE was therefore inconsistent with the DOT.  SSR 00-4p ("Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT.")   And "when there is a conflict," the ALJ was required to resolve it "by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information."  *Id.*  This, the ALJ did not do.

It appears, as Plaintiff asserts, the ALJ did not recognize the inconsistency at the hearing.  Knowing that Plaintiff claimed he could not read or write in English, and hearing the VE's testimony concerning jobs which required those skills, the ALJ nonetheless made no inquiries about the conflict.  SSR 00-4p ("When there is an apparent unresolved conflict between the VE . . . and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE[.]")  At no point during the hearing, or in subsequent vocational interrogatories, did the ALJ ask the VE to explain how a person like Plaintiff, who could not read or write in English, could perform any of those jobs.  *But cf. Martinez v. Colvin*, 2015 WL 5231973, at *6 (E.D. Cal. Sept. 8, 2015) ("ALJ and the VE had a conversation regarding Plaintiff's English language capabilities") (No. 1:14-

---

[4]  A hospital cleaner requires the ability to "[r]ead at rate of 190-215 words per minute" with a "[p]assive vocabulary of 5,000-6,000 words," and "[w]rite compound and complex sentences[.]"  DICOT 323.687-010.  A dining room attendant and sorter require the ability to "[r]ead at rate of 95-120 words per minute," "[r]ecognize [the] meaning of 2,500 (two- or three-syllable) words," and "[p]rint simple sentences[.]"  DICOT 311.677-018.  Finally, a sorter requires the ability to "[r]ead at rate of 95-120 words per minute," "[r]ecognize meaning of 2,500 (two- or three-syllable) words," and "[p]rint simple sentences[.]"  DICOT 569.687-022.

CV-1070-SMS)[5] *and Ramos v. Colvin*, 2015 WL 419973, at \*11 (C.D. Cal. Jan. 30, 2015) (holding reversal not warranted where "ALJ affirmatively asked whether the identified occupations could be performed by an individual 'who is not fluent in English' and VE "responded that the representative occupations were 'non-language preclusive'"") (No. CV 14-775 JC).  That the ALJ later explained in her written decision, "I . . . find restricting the claimant to simple, routine, tasks appropriate due to limited education and no understanding of the English language," does not cure the defect.  AR 20.

The ALJ's failure to recognize the conflict and resolve it was error and one which the Court cannot find to be harmless.  *See Gaona v. Colvin*, 2014 WL 1614846, at \*7 (N.D. Cal. Apr. 21, 2014) ("Yet the ALJ did not elicit any testimony regarding Mr. Gaona's ability to read and write and the evidence on this point is conflicting.") (No. 13-CV-03204 JCS).  Because all three jobs required reading and writing in English, an inability to do so would have left Plaintiff with no "other work," thereby undermining as the Commissioner's burden at step five and, in turn, the ALJ's finding of no disability.  Failing to resolve the apparent conflict, the Court cannot find the ALJ's decision here was based on substantial evidence, especially in light of the evidence.  And the Court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision."  *Zavalin v. Colvin*, 778 F.3d 842, 848 (9th Cir. 2015).

2.  Plaintiff's Pain Testimony

With regard to Plaintiff's pain testimony, the ALJ stated in relevant part:

> As for the claimant's credibility, I considered his allegations regarding his activities of daily living.  Although the claimant described daily activities, which were fairly limited, two factors weigh against considering these allegations . . . in favor of finding the claimant disabled.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.  Secondly, it is difficult to attribute that degree of limitation to the claimant's medical condition . . . in view of the relatively weak medical evidence and other factors discussed in this decision.  For example, diagnostic findings showed moderate degenerative disease, but this is not too

---

[5]  This unpublished decision is citable under Rule 32.1 of the Federal Rules of Appellate Procedure. *See also* 9th Cir. R. 36–3(b).

significant as there was no significant canal stenosis.  In addition, the claimant received conservative treatment and he reported that medication improved the symptoms.

The claimant's credibility is further undermined because diagnostic and other objective medical evidence failed to show a physiological basis for extreme pain and limitation alleged.  The fact that the claimant's course of treatment for low back pain was relatively conservative suggests that his symptoms and limitations are not as serious as alleged.  Furthermore, the claimant used a cane that was not prescribed to ambulate and was reluctant to try without it, but once he did, he was able to ambulate effectively without an assistive device.

I also consider the claimant's work history in assessing his credibility . . . .  The evidence of record raises a question as to whether the claimant's unemployment since the alleged onset of disability was actually due to his medical condition.  A review of the claimant's work history shows that the claimant never worked at substantial gainful activity levels within the past relevant 15 years.

AR 21.  The ALJ thus provided numerous reasons to support his finding concerning Plaintiff's credibility as it related to certain statements about the intensity, persistence, and limiting effects of his alleged pain or other symptoms.  Plaintiff contends, however, that all of these reasons fail.  In contrast, the Commissioner asserts that some of the ALJ's reasons, namely conservative treatment, meager work history and benign objective medical evidence, were proper reasons.

A claimant's statement of pain or other symptoms, without more, is not conclusive evidence of disability.  20 C.F.R. § 416.929(a).  Rather, "[a]n ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quotations omitted).  "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  *Id.* at 1014-15; *see Robbins,* 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an

applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."); SSR 96-7p (ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight.").  Factors an ALJ may consider include: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ must also give consideration to the factors enumerated in SSR 96-7p.[6] "It's not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible.  He must either accept [claimant's] testimony or make specific findings rejecting it." *Dodrill v. Shalala*, 12 F.3d 915, 918

---

[6] Social Security Ruling 96-7p states, in relevant part:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p (superseded by SSR 16-3p effective March 28, 2016).

(9th Cir. 1993) (citation and quotations omitted).

In this case, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. But as for some statements concerning the intensity, persistence and limiting effects of the symptoms, the ALJ did not find them entirely credible. AR 19. And because no evidence suggested Plaintiff was malingering, the ALJ was required to provide clear and convincing reasons for rejecting them.

In particular, the ALJ found questionable Plaintiff's testimony concerning his activities of daily living, made during the hearing and in the Exertion Questionnaire. She specifically recounted Plaintiff's written testimony that he felt dizzy, could not lift heavy objects, walk short or long distances, and shop or do chores. Based on the record, at least some of the reasons the ALJ provided find substantial support in the record, and clearly and convincingly show she could find Plaintiff not entirely credible.

For example, Dr. Damania, whose opinions Plaintiff does not dispute, opined that Plaintiff should be able to lift and carry as much as twenty pounds occasionally, stand and walk eight hours and sit for six hours out of an eight-hour workday. Dr. Damania found no evidence to justify Plaintiff's use of an assistive device, and observed him walk across the examination room unassisted. This belies the claim that he cannot lift heavy objects and walk short or long distances. Further, the evidence indeed reflects conservative treatment with regard to Plaintiff's back pain. At the hearing, he testified to taking medications for the stomach pains, heartburn, rectal bleeding, and seizures, and was treating his depression with weekly therapy. But no treatment was discussed with regard to back pain aside from lying down for eight hours per day. *See Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) ("in assessing a claimant's credibility, the ALJ may properly rely on unexplained or inadequately explained failure to seek treatment") (internal quotations and citations omitted); *Chaudhry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012) ("[I]f a claimant complains about disabling pain but fails to seek treatment . . . for the pain, an ALJ may use such failure as a basis for

15

finding the complaint unjustified or exaggerated[.]") (quotations and citation omitted).  And despite Plaintiff's numerous hospitalizations, they mostly stem from the onset of a seizure or abdominal pain, and less with his back pain.  Plaintiff's position that the ALJ's reasons all fail is therefore unavailing.

3.  RFC Determination

Finally, Plaintiff takes issue with the fact that the RFC determination and the VE's response to the hypotheticals did not account for his PTSD and major depressive disorder as diagnosed by the clinicians at FCMH.  He contends the ALJ's silence with regard to them was error.  Further, he argues the hypotheticals were deficient in that they did not account for his illiteracy.  The Commissioner counters that an ALJ is not required to take into account limitations which are unsupported by the record, which stem from properly rejected evidence or from Plaintiff's subjective complaints.

Plaintiff is correct that in making the RFC findings the ALJ was silent with regard to the diagnosed PTSD and major depressive disorder.  Social Security Ruling 96-8p ("In assessing RFC, the adjudicator must consider only limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe.")  But under the circumstances, the error here was harmless because the ALJ's refusal to include them in the RFC findings was not without reason.  There was no evidence in the record showing the opined PTSD and major depressive disorder caused functional limitations which had more than a minimal effect on Plaintiff's ability to work, and the ALJ explained this at step two. [7]  *See Burch v. Barnhart*, 400 F.3d 676, 684 (9th Cir. 2005)

_____

[7]  In her written decision, the ALJ stated in relevant part:

> I find that claimant's possible depression and posttraumatic stress disorder are not severe impairments within the meaning of the Social Security Act and Regulations because there is no evidence that these condition[s] have more than a minimal effect on the claimant's ability to work[.]  There is no evidence of functional limitations resulting from these conditions, and [t]here is also no evidence of more than

16

("Burch has not set forth, and there is no evidence in the record, of any functional limitations as a result of her obesity that the ALJ failed to consider.")  And indeed the record is devoid of such evidence, and Plaintiff has not shown otherwise.  Additionally, a reading of the mental examination by the FCMH clinicians suggests the diagnosis stemmed from Plaintiff's subjective complaints such that the ALJ was not required to adopt them.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("the ALJ took into account those limitations for which there was record support that did not depend on Bayliss's subjective complaints").

Plaintiff is also correct that the ALJ did not include illiteracy in the hypotheticals to the VE, which was therefore error.  To the extent the omission contributed to the ALJ's failure to resolve the conflict between the DOT and the VE's testimony at step five, such error was not harmless for the reasons discussed above.

## III.  CONCLUSION

Accordingly, the Court GRANTS Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. This action is REMANDED to the Commissioner for further

///

///

///

---

mild limitations involving daily activities, social functioning, or concentration with no episodes of decompensation.

The record showed the claimant generally denied depression, hopelessness, or anxiety . . . however, *on one occasion he reported hopelessness, sadness, and experiencing nightmares.  The mental examination was generally normal except for some psychomotor retardation and slowed speech[.]* A review of all of the medical evidence showed there was no follow-up mental health treatment, no use of psychotropic medication, no history of psychiatric hospitalizations, and no history of suicide attempts, which suggests the claimant's symptoms were as not as serious as alleged.

AR 17 (emphasis added).

1    administrative proceedings consistent with this opinion.  *See Marcia v. Sullivan*, 900 F.2d 172, 176

2    (9th Cir. 1990) *and Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).

3            The Clerk of Court shall enter judgment in favor of Plaintiff, Jose Luis Herrera Sanchez, and

4    against the Commissioner of Social Security.

5

6
     IT IS SO ORDERED.
7

8        Dated:    **October 26, 2016**                    **/s/ Sandra M. Snyder**
                                                      UNITED STATES MAGISTRATE JUDGE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28